# United States Court of Appeals
## For the First Circuit

No. 08-1217

VEASNA TOUCH; SOKLY CHAT,

Petitioners,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,[*]

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lipez, and Howard,
<u>Circuit Judges</u>.

<u>Joseph A. MacDonald</u> for petitioner.
<u>Gregory G. Katsas</u>, Assistant Attorney General, and <u>Gregory D. Mack</u>, Senior Litigation Counsel, Office of Immigration Litigation, for respondent.

June 4, 2009

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Eric H. Holder, Jr. has been substituted for former Attorney General Michael B. Mukasey as the respondent.

**LIPEZ**, **Circuit Judge**. Petitioners Veasna Touch ("Touch") and Sokly Chat ("Chat"), citizens of Cambodia, seek review of a decision of the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). Touch claims that he was persecuted by Cambodian government forces and supporters of the Cambodian People's Party on account of his political opinions, and that he will face persecution if he returns to Cambodia. The BIA rejected these claims and found that, even if it credited Touch's testimony, he failed to sufficiently prove past persecution or a well-founded fear of future persecution. Touch challenges these determinations.

Concluding that the evidence before the BIA did not compel it to find otherwise, we deny the petition.

**I**

On September 22, 2000, Touch entered the United States as a nonimmigrant, with authorization to remain until March 21, 2001. On March 5, 2001, he was joined by petitioner Chat, his wife. Touch filed an application for asylum and withholding of removal on June 7, 2001, listing Chat as a derivative applicant.[1] The

---

[1] Because Chat is a derivative applicant, her eligibility for asylum depends on the status of her husband, Touch. See 8 U.S.C. § 1158(b)(3)(A); Ymeri v. Ashcroft, 387 F.3d 12, 14 (1st Cir. 2004) ("[The applicant] filed an asylum application, and the other family members rely on his application as derivative applicants.").

-2-

Department of Homeland Security served both petitioners with a Notice to Appear and charged them with removability. At a hearing held in April 2004, Touch and Chat conceded removability but renewed their claims for asylum and withholding of removal, and requested relief under CAT.

According to evidence before the immigration judge ("IJ"), Cambodia is a constitutional monarchy whose elected government is controlled by the Cambodian People's Party ("CPP"). After elections in 1993, CPP formed a coalition with a rival party, the National United Front for a Neutral, Peaceful, Cooperative, and Independent Cambodia ("FUNCINPEC"). The coalition broke down in 1997, when the CPP leader, Hun Sen, led a violent coup against the government, removing FUNCINPEC leaders and arresting and killing their supporters. Elections in 1998 again led to violence, when government forces and CPP supporters clashed with supporters of FUNCINPEC and another rival political party, the Sam Rainsy party. Today CPP still dominates the parliament, where Hun Sen serves as prime minister.

Touch testified that he first became interested in Cambodian politics in 1993, after discussions with his brother-in-law, Dak Savy, who was secretary of the FUNCINPEC party at the time. These discussions prompted Touch to join FUNCINPEC and begin campaigning on their behalf. In the period before the 1993 elections, Touch spent twenty hours a week campaigning, sometimes

delivering speeches in support of FUNCINPEC. Touch regularly received threats from CPP supporters for his political activity. In March 1993, Touch and others spoke at a campaign event at the Kropom Chouk commune. During the event, a group of seven or eight individuals got up and left, evidently displeased with the speakers. Later, when Touch and the other campaigners were driving home, the group appeared on the side of the road and fired on the campaigners' car. Touch escaped serious injury by diving to the car floor. The driver of the car, however, was shot in the shoulder, and another occupant was shot in the back.

In August 1993, two uniformed soldiers riding a motorcycle threw a grenade at Touch's car, shouting, "this is your gift for helping the FUNCINPEC party." Touch was able to avoid the grenade by braking. It exploded and blew out his front left front tire and damaged the front of the car. Touch was not injured.

After the 1993 elections, Touch received a job through his brother-in-law at the Cambodian Ministry of the Interior. Touch held this position for over four years, until July 1997, when he left in the wake of the coup led by Hun Sen. Concerned that he might be targeted by CPP forces, Touch and his family fled Phnom Penh for the Kandal province. Touch remained there for three or four months.

Sometime after his return to Phnom Penh, in 1998, Touch changed political affiliations and joined the Sam Rainsy party. In

preparation for national elections in July, Touch collected donations and participated in Sam Rainsy campaign events. The CPP won the election. Months of political unrest followed. Touch participated in a series of political demonstrations in early September 1998, protesting the election results. In the first of these demonstrations, held on September 7 at the railroad station near the University of Medicine, Touch spoke to a crowd of around 1,000 people. At some point, police fired on the demonstrators and drove a car into the crowd, killing several people. Touch testified that he was hit by the car, but managed to escape in the confusion. At another demonstration held the same day at Independence Monument, Touch was tied up, beaten, and forced to drink wastewater by the police. He later became sick as a result.

The next day, September 8, Touch joined a demonstration of 3,000 individuals, including students and Buddhist monks. He was arrested by a police officer and beaten. Touch again joined a demonstration on September 9, when 2,000 people marched from the U.S. Embassy to the Cambodian National Assembly. Touch carried a banner calling Hun Sen a "traitor" and demanding that he step down. When police attacked the demonstrators, an officer struck Touch with the butt of his rifle, causing him to collapse. He managed to escape and again fled to a village in Kandal province. However, that night two police officers came to Touch and Chat's home in Phnom Penh. They questioned Chat at gun point about Touch's

whereabouts, and threatened to kill Touch when they found him. Chat urinated on herself in fear. The police stayed for thirty minutes and searched the home, but they did not harm Chat. She fled to her mother's house the next day, where she stayed for two weeks.

Touch remained in Kandal province for three months. When he returned to Phnom Penh, he shuttled between his mother's and sisters' homes. The police never returned to look for him. For the next two years, Touch continued to work for the Sam Rainsy party and assisted his wife with her business. In 2000 he obtained a passport through political associates who worked at the passport office. On September 21, 2000, Touch boarded a flight and entered the United States the next day. He testified that he has not been interested in Cambodian politics since his arrival in the United States.

On June 13, 2006, the IJ issued an opinion finding Touch not credible and denying his application for asylum, withholding of removal, and relief under CAT. Touch and Chat appealed. On January 31, 2008, the BIA reversed the IJ's credibility determination, but affirmed her order denying relief. It found that even if the applicants' testimony were credited, they had failed to prove past persecution or a well-founded fear of future persecution. This petition for review followed.

## II

When the BIA adopts aspects of the IJ's opinion, we review those portions of the opinion in addition to the BIA decision itself. Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir. 2009). In contrast, "[w]hen the BIA issues its own opinion, we review the Board's decision and not the immigration judge's." Georcely v. Ashcroft, 375 F.3d 45, 49 (1st Cir. 2004); Albathani v. I.N.S., 318 F.3d 365, 373 (1st Cir. 2003) ("Ordinarily, Courts of Appeals review decisions of the [BIA], and not those of an IJ. When the BIA does not render its own opinion, however, and either defers [to] or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ." (internal quotation marks, footnote, and citation omitted)).

The standard of review for claims of asylum, withholding of removal, and relief under the CAT is "substantial evidence." Rashad v. Mukasey, 554 F.3d. 1, 4 (1st Cir. 2009). Under this standard, we do not disturb findings if they are "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). This is a difficult standard for petitioners to surmount. We reverse only if "'any reasonable adjudicator would be compelled to conclude to the contrary.'" Tobon-Marin v. Mukasey, 512 F.3d 28, 30 (1st Cir. 2008) (quoting 8 U.S.C. § 1252(b)(4)(B)).

"[V]acatur requires that the evidence point unerringly in the opposite direction."  Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005) (internal quotation marks and citation omitted).

**A. Asylum and Withholding of Removal**

Asylum is a discretionary form of relief, available only to an individual who can prove that he is a "refugee" within the meaning of the Immigration and Nationality Act ("INA").  Bonilla v. Mukasey, 539 F.3d 72, 78 (1st Cir. 2008) (citing 8 U.S.C. § 1158(b)(1)).  Under the INA, a "refugee" is a person outside his country of nationality who is "unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A).  Proof that persecution has a ten percent chance of occurring suffices to make a fear of persecution "well-founded." See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987).

Proof of past persecution raises a rebuttable presumption of a well-founded fear of future persecution.  Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 21 (1st Cir. 2004).  That presumption may be defeated only if the government demonstrates, by a preponderance, either: (1) that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution, or (2) that the applicant could avoid

-8-

persecution by relocating to another part of the country of nationality. Id.

1. Past Persecution

Proving past persecution is a "'daunting task.'" Butt v. Keisler, 506 F.3d 86, 90 (1st Cir. 2007) (quoting Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006)). The mistreatment complained of must have "reached a fairly high threshold of seriousness, as well as some regularity or frequency." Id. "An important factor in determining whether [mistreatment amounts to persecution] is whether the mistreatment can be said to be systematic rather than reflective of a series of isolated incidents." Bocova, 412 F.3d at 263 (citing In re O-Z & I-Z, 22 I & N Dec. 23, 26 (BIA 1998)). "[M]istreatment ordinarily must entail more than sporadic abuse in order to constitute persecution." Id.; Guzman v. I.N.S., 327 F.3d 11, 15-16 (1st Cir. 2003).

In this case, the BIA concluded that petitioner failed to establish that the March 1993 incident was on account of political opinion, that any presumption of a well-founded fear of future persecution created by the August 1993 incident was rebutted, and that the incidents of September 1998, including the unfulfilled threat against Touch, did not amount to persecution. Petitioner challenges each one of these determinations.

a. The March 1993 shooting was not on account of political opinion

Regarding the March 1993 incident, Touch testified to the IJ that he had been speaking at a political meeting, and that 7 or 8 individuals walked out of the meeting because "they don't like our speech."  Later, those same individuals shot at the car in which Touch was riding.  Although this testimony certainly suggests that the shooters attacked Touch on account of his political opinions, we may reverse only if the BIA was <u>compelled</u> to draw that conclusion.  <u>See</u> <u>Tobon-Marin</u>, 512 F.3d at 31 (concluding that motive was not sufficiently proven because it remained possible to explain the attackers' conduct in another way).  Here, the IJ noted that other explanations for the attack were possible.  "The attackers did not wear any uniform and did not say anything to respondent.  It is at least as likely that the attackers were common thieves as government forces.  The connection between respondent's campaigning . . . and the actual shooting is mere speculation."  The evidence does not compel a contrary conclusion.

b. Any presumption resulting from the August 1993 event was rebutted by subsequent events

The BIA's conclusions about the incident in August 1993 are also supported by substantial evidence.  While the grenade attack was undoubtedly serious, there was evidence refuting any presumption of a well-founded fear of future persecution.  Touch testified that after the August 1993 attack, he retained his job at

-10-

the Cambodian Ministry of the Interior. He also remained an active FUNCINPEC member. In fact, Touch testified to no incidents of mistreatment during the next five years, until 1998, when he switched political parties. A long period without mistreatment followed by disassociation with the target political organization supports the BIA's conclusion that the August 1993 attack does not give Touch reason to fear future persecution. See Pieterson v. Ashcroft, 364 F.3d 38, 41, 45 (1st Cir. 2004) (affirming the BIA where the applicant could point to no acts of persecution against her during a five-year period in which she was uninvolved in politics).

c. The events of September 7, 8, and 9 do not amount to persecution

The BIA's conclusion that Touch's mistreatment during the protests of September 7, 8 and 9 did not rise to the level of persecution was supported by substantial evidence. As the IJ pointed out, the government's mistreatment of Touch was largely a "spasmodic" response to his participation in the protests. See Guzman, 327 F.3d at 15. Moreover, although the government unquestionably mistreated Touch during the protests -- beating him and forcing him to drink wastewater -- Touch did not suffer serious or permanent injuries. Albeaj v. Gonzales, 469 F.3d 188, 192 (1st Cir. 2006) ("[A]lthough the police beat Albeaj during a pro-democracy demonstration in 1990, . . . Albeaj never testified to any permanent or serious injuries."). On this record, the BIA was

-11-

not compelled to conclude that the government's conduct during the September demonstrations amounted to persecution.

The most serious of the events of September 1998 was the threat against Touch's life on September 9. Unfulfilled threats rarely prove past persecution, being construed more naturally as evidence of a well-founded fear of future persecution. Lim v. INS, 224 F.3d 929, 936 (9th Cir. 2000). Such threats are evidence of past persecution "[i]n certain extreme cases, . . . particularly where those threats are combined with confrontation or other mistreatment." Id. The unfulfilled threat must be "'so menacing as to cause significant actual suffering or harm.'" Butt, 506 F.3d at 91 (quoting Lim, 224 F.3d at 936); see also Tamara-Gomez v. Gonzales, 447 F.3d 343, 346-47, 349 (5th Cir. 2006) (finding past persecution where the FARC regularly threatened the applicant with death, told his wife they would kill him and kidnap their sons, bombed his neighborhood, broke into and vandalized his home, and tracked and murdered several of his associates); Li v. Atty Gen. of the U.S., 400 F.3d 157, 164-65 (3d Cir. 2005).

While there is no doubt that the threat to Touch was serious, the BIA was not compelled to conclude that it rose to the level of persecution. Although Chat was understandably scared, she was not harmed during the encounter with the police officers. The officers never returned to their home, and never threatened Touch or his family again. When Touch returned to Phnom Penh after three

months in hiding, he again became politically active, collecting food and money for the Sam Rainsy party and attending meetings at party headquarters. The BIA thus had substantial evidence to conclude that the threat was not extreme enough to rise to the level of persecution. See Lim, 224 F.3d at 936 (concluding that a threat did not rise to the level of persecution where "Lim carried on for six years without harm and without fleeing").

Notably, the BIA appears to have viewed the record in this case as showing a number of serious isolated incidents, rather than systematic political persecution. More than five years separated the events of August 1993 from those of September 1998. As the BIA pointed out, Touch worked in the government and continued to be politically active during this time. After the events of September 1998, Touch remained in Cambodia without incident for two more years. It has now been eight years since Touch left Cambodia, and his family there has not been mistreated in that time. He is no longer politically active. Considered as a whole, this record does not compel the conclusion that Touch has been subject to a "pattern of targeted political harassment." Topalli, 417 F.3d at 132.

For these reasons, we find that the BIA's determination that Touch did not suffer past persecution is supported by substantial evidence.

2. Future Persecution

To prove a "well-founded fear of future persecution," an applicant must show that his fear of persecution is both subjectively genuine and objectively reasonable. See Bocova, 412 F.3d at 262. In this case, the BIA noted that Touch and Chat "continued to live without incident for a prolonged period following the September 1998 police threat," that Touch "had no problems in leaving his homeland" or obtaining a visa, and that Touch currently has no interest in Cambodian politics. Moreover, "[t]here has been no showing that anyone, including the police or any Cambodian official, is currently interested in either [Touch or Chat] for any reason, much less based on their political views or the political activities last engaged in by [Touch] over 7 years ago." The BIA held that this record does not establish a well founded fear of being persecuted upon returning to Cambodia. The evidence does not compel a contrary result.

We need not independently reach the question of withholding of removal. The standard of proof required for asylum ("well-founded fear of persecution") is less stringent than that required for withholding of removal ("more likely than not to face persecution"). See Salazar v. Ashcroft, 359 F.3d 45, 52 (1st Cir. 2004). It follows that if an applicant is unable to prove eligibility for asylum, the applicant will be unable to prove eligibility for withholding of removal. Bocova, 412 F.3d at 262.

**B. Convention Against Torture**

Touch also asks us to reverse the determination that he did not qualify for relief under CAT.  See 8 U.S.C. § 1231; 8 C.F.R. § 1208.16(c).  However, Touch fails to develop any argument to this end in his brief.  For this reason, we deem the argument waived.  See Negeya v. Gonzales, 417 F.3d 78, 85 (1st Cir. 2005); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The petition for review is denied.