# United States Court of Appeals
## For the First Circuit

No. 20-1789

EBER ISAIAS HERNANDEZ-MENDEZ,

Petitioner,

v.

MERRICK B. GARLAND,*
Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before
Barron, Chief Judge,
Howard, Circuit Judge,
and Singal, District Judge.*

Daniel T. Welch, with whom Kevin P. MacMurray and MacMurray & Associates were on brief, for petitioner.

Aric A. Anderson, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, was on brief, for respondent.

---

*  Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Merrick B. Garland has been substituted for former Attorney General William P. Barr.

*  Of the District of Maine, sitting by designation.

November 15, 2023

**HOWARD**, <u>Circuit Judge</u>.  Eber Isaias Hernandez-Mendez, a citizen of Guatemala, petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of his application for withholding of removal and asylum under the Immigration and Nationality Act ("INA").  For the following reasons, we deny the petition.

## I.

## A.

Eber Isaias Hernandez-Mendez ("Hernandez-Mendez") is a 30-year-old Guatemalan citizen who has lived in the United States since 2013.  Because the IJ found him credible and the BIA did not disturb that finding, "we accept as true [Hernandez-Mendez's] testimony about the historical facts."  <u>See</u> <u>Palma-Mazariegos</u> v. <u>Gonzales</u>, 428 F.3d 30, 33 (1st Cir. 2005).

Hernandez-Mendez is a member of the Mam ethnic group, an indigenous group with its own dialect.  He speaks both Spanish and Mam.  He was born in Choapequez, a village that has a population of about 400 or 500 people.  Throughout his childhood, the residents of Choapequez were involved in an ongoing and violent land dispute over a border with the residents of the municipality of Tajumulco.

Hernandez-Mendez's family was extremely poor; his youngest brother passed away at some point due to malnutrition.  When Hernandez-Mendez was fifteen or sixteen years old, he moved

- 3 -

from his town of Choapequez to the capital city, Guatemala City, to work so that he could financially support his family. He remained in Guatemala City for about one year.

Two incidents that occurred in Guatemala City (and a later one in Choapequez) are relevant to Hernandez-Mendez's petition for review. First, about two or three months after Hernandez-Mendez moved to Guatemala City, he was walking in the streets and was approached by a group of three or four people, who "asked [him] why was [he] was [] in that place [and] [told him] that [he] shouldn't be there" and who "treated [him] like [], like an indigenous person." The group was unarmed, and he was not physically harmed, but "received [] threats from them . . . to leave that place."

Second, about two to three months later, Hernandez-Mendez was approached again, this time by a group of six to seven people, two of whom had been involved in the previous incident, and this time they were armed with knives, firearms, and long sticks. He testified that "they said that if they ever found [him] once more, they need[ed] [him] to know what was going to happen," which he understood to mean that "they wanted to kidnap [him]." They robbed him of his belongings but did not physically harm him.

He reported the second incident to the police.[1]

After that second incident, Hernandez-Mendez returned to live with his parents in his hometown of Choapequez. When he returned, the land dispute with Tajumulco was still ongoing and had grown "even worse," and community members approached him and asked him to engage in the fighting with them. He declined to do so because he was "afraid" and did not want to "lose [his] life because they were really fighting with fire guns." They told him that he should think about it "very carefully," because they were going to ask him again. Two months later, Hernandez-Mendez's mother had passed away, and he became more frightened, because he thought that it was more likely that they would come back again and ask him to join the fighting, now that his mother was gone.

---

[1] In a March 2018 affidavit, Hernandez-Mendez attested that, in addition to those two incidents, on several other occasions, the same gang members in Guatemala City tried to recruit him, asked him for money, and threatened to kill him. He was cross-examined about those additional incidents at the hearing before the IJ, and affirmed that such statements were true.

In his petition for review before this court, however, Hernandez-Mendez does not mention those additional incidents. In addition, at oral argument, his counsel asserted that we should not rely on the portion of the affidavit describing them as part of the case because language barriers between Hernandez-Mendez and his counsel, among other items, had affected that portion of the affidavit, and Hernandez-Mendez had in fact been discussing threats he received from members of his village, not from gang members in Guatemala City (though, threats of that nature are not mentioned in his petition for review in describing his interactions with members of his village, either). Accordingly, we have not considered any other incidents with gang members in Guatemala City in our consideration of Hernandez-Mendez's petition for review.

It was at that point that he decided to walk to the United States through Mexico. After walking and taking some trains as well, he entered the United States without inspection in April 2013 at the age of eighteen.

**B.**

The Department of Homeland Security served Hernandez-Mendez with a Notice to Appear in April 2013, alleging that he was removable as an unauthorized alien present without admission or parole. He admitted the factual allegations and conceded that he was removable. As relevant here, Hernandez-Mendez applied for asylum and claimed withholding of removal, basing both on his membership in two particular social groups -- "young men singled out by gangs who have refused to obey gang instructions" and his Mam ethnicity.

The Immigration Judge ("IJ") denied Hernandez-Mendez's applications and ordered him removed in an oral decision in April 2018. He appealed that decision, and the BIA dismissed that appeal in August 2020.

This petition for review followed.

**II.**

The BIA issued its own decision on Hernandez-Mendez's claims; thus we review that final agency decision. Reynoso v. Holder, 711 F.3d 199, 205 (1st Cir. 2013). Nevertheless, where "the BIA accepts the IJ's findings and reasoning yet adds its own

- 6 -

gloss, we review the two decisions as a unit." Cabrera v. Lynch, 805 F.3d 391, 393 (1st Cir. 2015). The parties agree that, with one exception not relevant to our decision, the BIA accepted the IJ's findings and reasoning.

We review the agency's findings of fact under the "substantial evidence" standard. Bonilla v. Mukasey, 539 F.3d 72, 76 (1st Cir. 2008). Under that standard, the agency's determination "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). "To reverse . . . we must find that the evidence not only supports [a contrary] conclusion, but compels it." Id. at 481 n.1 (emphasis in original).

In his petition, Hernandez-Mendez challenges the denial of his asylum and withholding of removal claims. To establish eligibility for asylum, a petitioner must prove that he qualifies as a refugee. 8 U.S.C. § 1158(b)(1). A refugee is a person who is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Thus, a petitioner may establish eligibility for asylum either by (1) demonstrating past persecution, thereby creating a presumption of a well-founded fear of future persecution; or (2) otherwise

demonstrating a well-founded fear of future persecution.  See Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001).  A well-founded fear of future persecution on account of a protected ground means a "reasonable possibility" of harm for purposes of asylum. Hincapie v. Gonzales, 494 F.3d 213, 218 (1st Cir. 2007).

To establish eligibility for withholding of removal, an applicant must show that his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  The "threat to life or freedom" under withholding of removal is "identical" to "persecution" under asylum, except that the "burden placed on the petitioner is higher."  Wiratama v. Mukasey, 538 F.3d 1, 3 (1st Cir. 2008). Specifically, to qualify for withholding of removal, a petitioner must demonstrate "either that [he] has suffered past persecution on account of a protected ground (thus creating a rebuttable presumption that [he] may suffer future persecution) or that it is more likely than not that [he] will be persecuted on account of a protected ground if sent to the destination country." Id. at 4 (alteration in original) (emphasis added) (quoting Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007)); see also INS v. Stevic, 467 U.S. 407, 429-30 (1984) (an applicant for withholding of removal must establish a "clear probability" of persecution because of a protected ground).  Thus, "an alien who cannot

establish the elements of an asylum claim cannot prevail on a counterpart claim for withholding of removal." Jianli Chen v. Holder, 703 F.3d 17, 27 (1st Cir. 2012).

### III.

### A.

We begin with Hernandez-Mendez's asylum claim. First, he challenges the agency's conclusion that the mistreatment he experienced did not rise to the level of past persecution. Here, his focus is on the two incidents with gang members in Guatemala City.

We review "findings of fact -- including whether persecution occurred on account of a protected ground -- under the familiar and deferential substantial evidence standard." Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014) (quotations omitted). And we have explained that persecution "normally involves severe mistreatment," meaning that the "sum of [a petitioner's] experiences . . . add up to more than ordinary harassment, mistreatment, or suffering." See id. at 87, 91 (alteration in original) (quotations omitted). And generally, "some regularity and frequency" of the mistreatment is also required. Id.

Unfulfilled threats "rarely" prove past persecution and are typically construed instead "as evidence of a well-founded fear of future persecution." Touch v. Holder, 568 F.3d 32, 40

- 9 -

(1st Cir. 2009).  However, in "certain extreme cases" such threats may prove past persecution, "particularly where those threats are combined with confrontation or other mistreatment."  Id. (quotations omitted).  To qualify, the unfulfilled threat must be "so menacing as to cause significant actual suffering or harm." Id. (quoting Butt v. Keisler, 506 F. 3d 86, 91 (1st Cir. 2007)).

Here, Hernandez-Mendez was threatened on two occasions in Guatemala City, but the threats -- which he understood to be threats of kidnapping -- were not fulfilled.  The question is thus whether those threats represent that extreme case in which, though unfulfilled, they caused significant actual suffering or harm.  In the first incident, three or four gang members surrounded Hernandez-Mendez and told him that he should not be in Guatemala City and to leave, but none of them were armed.  However, in the second, though he again left unharmed, a group of six or seven members, two of whom had been present during the first incident, approached him armed with knives, firearms and long sticks, robbed him of all of his belongings, and stated that "if they ever found [him] once more" they needed him to know "what was going to happen."  Both incidents were on account of his Mam ethnicity.

We do not doubt that the mugging incident in particular was terrifying, especially because the gang members preyed upon Hernandez-Mendez because of his indigenous ethnicity.  But while the threats were condemnable, the record does not compel the

- 10 -

conclusion that they rose to the level of persecution. Hernandez-Mendez did return to his village after the second incident. But he otherwise does not explain why the threats caused him significant actual suffering or harm.

In his petition, Hernandez-Mendez resists that conclusion by arguing that the IJ did not give his young age enough weight when considering whether he had been persecuted. It is true that "age can be a critical factor in determining whether a petitioner's experiences cross th[e] [persecution] threshold." Ordonez-Quino, 760 F.3d at 91 (quotations omitted) (collecting cases). In Ordonez-Quino, we explained that "[w]here the events that form the basis of a past persecution claim were perceived when the petitioner was a child, the fact-finder must look at the events from [the child's] perspective, [and] measure the degree of [his] injuries by their impact on [a child] of [his] age []." Id. (alterations in original) (quoting Hernandez-Ortiz v. Gonzales, 496 F.3d 1042, 1046 (9th Cir. 2007)).

But the IJ does appear to have considered Hernandez-Mendez's age at the time of the incidents at issue. The IJ explicitly noted in the IJ's discussion of past persecution that Hernandez-Mendez was "still of a relatively young age" when he returned to his village at age seventeen and was recruited to join the conflict between his village and Tajumulco, from which we can infer that the IJ was aware of Hernandez-Mendez's age at the time

- 11 -

of the incidents in Guatemala City as well. In addition, the IJ explicitly noted in the background section that he was fifteen or sixteen when he moved to Guatemala City. And, because Hernandez-Mendez was at least fifteen or sixteen years old (and more likely seventeen) by the time of the second incident, this case is unlike Ordonez-Quino, in which the petitioner was five or six years of age at the time of the incidents at issue. Ordonez-Quino, 760 F.3d at 92. As the Ninth Circuit has explained, events experienced "as a teenager" are distinguishable from those experienced "by the far-younger asylum applicants." Theodore v. Lynch, 640 F. App'x 653, 655 (9th Cir. 2016); see also Liu v. Ashcroft, 380 F.3d 307, 314 (7th Cir. 2004) (noting that although the petitioner was a minor, she was "near the age of majority -- she was sixteen" and thus discounting the significance of her age in that case). Accordingly, "[w]hatever slight calibration" Hernandez-Mendez's age may have warranted in the agency's analysis was "insufficient to transform [his] experiences . . . from harassment to persecution." Liu, 380 F.3d at 314.

For those reasons, we conclude that this is not the rare case in which the record compels a conclusion that the unfulfilled threats Hernandez-Mendez experienced amounted to past persecution, rather than ordinary harassment, mistreatment, or suffering.

**B.**

The next issue is whether the agency's finding that

Hernandez-Mendez also had not proved a well-founded fear of future persecution on account of a particular social group is supported by substantial evidence. Hernandez-Mendez pointed to fear on account of his Mam ethnicity and on account of his membership in a group of "young males who have been singled out by gangs and who have refused to obey gang instructions." We address each in turn.

**i.**

As to Hernandez-Mendez's Mam ethnicity, although the IJ acknowledged that that group was a cognizable particular social group, the IJ found that Hernandez-Mendez had not established that he had a well-founded fear of persecution on account of membership in that group because efforts to recruit him into the land dispute when he returned to his village were unrelated to his Mam ethnicity. The BIA agreed, adding that Hernandez-Mendez had not established a well-founded fear of persecution on account of a protected ground by the gang members from Guatemala City because he did not testify that the gang members would further threaten him in his village. It noted that, rather, he feared returning to his village because he did not want to get caught up in the land dispute, which the BIA considered to be a general condition of strife.

The agency's findings in this regard were supported by substantial evidence. A petitioner does not have a well-founded fear of persecution if he could "avoid persecution by relocating

to another part of [his] country of nationality . . . if under all the circumstances it would be reasonable to expect [him] to do so."  8 C.F.R. § 1208.13(b)(2)(ii); see also Gao v. Barr, 950 F.3d 147, 153 (1st Cir. 2020); Singh v. Holder, 750 F.3d 84, 86-87 (1st Cir. 2014) (noting that petitioner lacked a well-founded fear of persecution given his "ability to move to Delhi and remain in India for several months without further harassment or arrest after his mistreatment at home").  Hernandez-Mendez has in no way challenged the BIA's implicit finding that it was reasonable for him to relocate to his village and that he did not have a well-founded fear of persecution as a result.[2]

As noted by the BIA, Hernandez-Mendez does not demonstrate that when he left Guatemala City, the gang members who threatened him on account of his Mam ethnicity followed him to his hometown of Choapequez or were present there in any other way; rather, the mistreatment he experienced while he was back in Choapequez involved the attempts of certain townspeople to recruit

---

[2] At oral argument, counsel for Hernandez-Mendez contended that his ability to relocate should be discounted because he went to Guatemala City to find employment, leaving required him to forfeit that employment, and his village lacks gainful employment opportunities.  He has not challenged in any manner the BIA's statement that returning to his village would alleviate the claimed mistreatment by the gang members in Guatemala City.  Thus, we do not examine the merits of his contention raised at oral argument because it is waived.  See Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990) ("Except in extraordinary circumstances not present here, a court of appeals will not consider an issue raised for the first time at oral argument.").

him for that violent dispute.  Hernandez-Mendez does not suggest that those attempts were on account of his Mam ethnicity.

For all of those reasons, substantial evidence supports the agency's finding that Hernandez-Mendez has not established a well-founded fear of persecution on account of his membership in the Mam indigenous group.

**ii**.

Hernandez-Mendez also contends that he has a well-founded fear of future persecution on account of his membership in a group of "young males who have been singled out by gangs and who have refused to obey gang instructions."  We agree with the IJ and the BIA that he has not demonstrated that that proposed group is a cognizable social group.[3]

For a proposed particular social group to be cognizable, the BIA requires that it be "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."  Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015) (quotations omitted).  The question whether a group is a "particular social

---

[3] As noted, Hernandez-Mendez relies only on the two incidents with gang members in Guatemala City and the recruitment by members of his village in the land dispute as evincing his well-founded fear of future persecution.  And as to his claim of persecution on account of his membership in the group of young males who have refused to obey gang instructions, the persecutors at issue appear to be the group in his village who have attempted to recruit him into the land dispute.

group" within the meaning of the INA is a question of law that we review de novo. See 8 C.F.R. § 1003.1(d)(3)(ii).

Here, the IJ found that Hernandez-Mendez's proposed group of "young males . . . singled out by gangs" who have "refused to obey gang instructions" was not a cognizable social group because, according to the IJ, (1) a social group cannot be defined by the claimed persecution, and alternatively, (2) the proposed group was not socially distinct or defined with sufficient particularity.

The BIA agreed with the IJ that the proposed group at issue was not cognizable. It added, however, that the group was also "insufficient to establish particularity because 'victims of gang violence often come from all segments of society, and they possess no distinguishing characteristic or concrete trait that would readily identify them as members of such a group," quoting Matter of A-B-, 27 I. & N. Dec. 316, 335 (A.G. 2018) ("A-B-I"). It further noted that "[Hernandez-Mendez] ha[d] not adequately explained how his case is distinguishable from applicable precedent."

As noted, Hernandez-Mendez agrees that the BIA adopted the IJ's decision. Here, the IJ found that Hernandez-Mendez's proposed social group was not socially distinct or defined with sufficient particularity. Yet Hernandez-Mendez makes no effort at all in his petition for review to dispute those findings.

Accordingly, because of that omission, he has waived any argument as to them.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

In any event, we disagree with the argument that he does develop in his petition as to that proposed social group -- that is, that the BIA's quotation of A-B-I requires remand because, among other reasons, it was vacated by Matter of A-B-, 28 I. & N. Dec. 307 (A.G. 2021) ("A-B-III") after the BIA rendered its decision in this case.

The A-B-III opinion explained its reasons for vacating A-B-I in relevant part as follows:

> [T]he [A-B-I] opinion beg[an] with a broad statement that 'victims of private criminal activity' will not qualify for asylum except perhaps in 'exceptional circumstances.' . . . That broad language could be read to create a strong presumption against asylum claims based on private conduct.  As a result, A-B-I threatens to create confusion and discourage careful case-by-case adjudication of asylum claims.

A-B-III, 28 I. & N. Dec. at 308-09 (quoting A-B-I, 27 I. & N. Dec. at 317).  For those reasons, among others, A-B-III held that "the Board should no longer follow A-B-I . . . when adjudicating pending or future cases . . . [and] should [instead] follow pre-A-B-I precedent."  Id. at 309.

Thus, Hernandez-Mendez is correct that the BIA quoted A-B-I for a proposition that is no longer good law.  Nevertheless, A-B-I did not create (nor did A-B-III abrogate) the existing

- 17 -

general rule stated in the BIA's decision (just before the problematic quotation) that for a particular social group to be cognizable, it must be "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015) (quotations omitted). And the BIA adopted the IJ's reasoning, which did not rely on A-B-I whatsoever but rather found, among other things, that Hernandez-Mendez had not demonstrated that his proposed social group was defined with particularity or was socially distinct. Accordingly, for both of those reasons, the BIA's affirmance was based upon a case-specific application of that more established test, and the problematic quotation does not require us to remand.

We thus conclude that the agency did not commit legal error in the legal standard that it applied. We also see no merit to Hernandez-Mendez's challenge to the agency's finding that he did not establish that his group of "young males who have been singled out by gangs and who have refused to obey gang instructions" was a cognizable social group on the basis that Hernandez-Mendez has failed to develop, and thereby has waived, any arguments as to those findings. Accordingly, any asylum claim based on that group fails.

## C.

A petitioner who cannot establish the elements of an

asylum claim cannot prevail on "a counterpart claim for withholding of removal." Jianli Chen, 703 F.3d at 27. Therefore, for the same reasons we rejected his contentions as to his asylum claim, we also reject Hernandez-Mendez's contentions as to his withholding of removal claim.

## IV.

For the foregoing reasons, we **deny** the petition for review.