# United States Court of Appeals
## For the First Circuit

_____

No. 07-1149

SONNY WIRATAMA,

Petitioner,

v.

MICHAEL B. MUKASEY,
Attorney General of the United States,

Respondent.

_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OR IMMIGRATION APPEALS

_____

Before

Lynch, Chief Judge,
Cudahy,* Senior Circuit Judge,
and Torruella, Circuit Judge.

_____

Damon M. D'Ambrosio on brief for the petitioner.
Jeffrey S. Bucholtz, Acting Assistant Attorney General,
Michelle E. Gorden Latour and Kohsei Ugumori on brief for the
respondent.

_____

July 9, 2008

_____

*Of the Seventh Circuit, sitting by designation.

**CUDAHY, <u>Senior Circuit Judge</u>**.  Petitioner Sonny Wiratama, a native and citizen of Indonesia, appeals from a final order of the Board of Immigration Appeals (the Board), denying his applications for asylum, withholding of removal and protection under the Convention Against Torture (the Convention).  In a brief order, the Board largely affirmed and adopted the decision of the immigration judge (IJ).  The IJ had dismissed Wiratama's asylum application as untimely and dismissed his applications for withholding of removal and protection under the Convention as without merit after finding that Wiratama had failed to present "credible evidence" that he would likely suffer persecution if returned to Indonesia.

Wiratama now challenges the IJ's adverse credibility determination.  We agree with Wiratama that the IJ's adverse credibility determination does not find substantial support in the record and was not accompanied by cogent reasoning.  In fact, we believe that portions of Wiratama's testimony have been mischaracterized both by the IJ and by the government.  We deny Wiratama's petition, however, because even if his testimony had been fully credited, he would have failed to establish that he had a reasonable fear of persecution.

## I.

Wiratama is Roman Catholic; his ancestry is Chinese. Both of these attributes make him a minority in Muslim-dominated Indonesia. Wiratama fled Indonesia because he feared persecution on account of his race and religion. He entered the United States on March 8, 2001 as a non-immigrant visitor authorized to remain in the United States until September 7, 2001. On March 28, 2003, the Department of Homeland Security issued him a Notice to Appear, charging him with removability because he had stayed longer than permitted. On April 20, 2005, Wiratama applied for asylum, withholding of removal, protection under the Convention Against Torture and, in the alternative, voluntary departure.

Wiratama's removal hearing was held on May 23, 2005. He testified that he had been subject to discrimination since his youth. It was apparently common for both classmates and teachers to play "cruel jokes" on him and to make "ethnic slurs" in front of the entire class. He was frequently subjected to physical abuse by his classmates; school officials looked the other way. The situation became so bad that his parents were forced to place him in a private, Catholic school from 1992 to 1993. His parents then sent him to study in Australia from 1994 to 1996.

Wiratama returned to Indonesia in 1997. In January 1998, Wiramata claims that he was stopped in traffic when a group of men, shouting racial epiteths, smashed his car window and pulled him

- 3 -

from his car.  The men beat Wiramata with their fists, tore his clothing, and "slashed" him on his right hand with a knife.  The men then took his money and his cell phone and left Wiratama lying on the side of the road. Wiratama got back in his car and went to pick up his girlfriend at school; he then drove to this house, where his mother treated him with traditional Chinese medicines. Wiratama never went to the hospital.

In May 1998, Wiratama was working at a jewelry store when a riot erupted outside the building.  Cars were being set ablaze, and a mob of young native Indonesians was robbing and beating any ethnic Chinese they encountered.  Wiratama was instructed to flee the building.  He hid behind buildings and cars but he was eventually spotted and chased by the mob.  They tried to grab Wiratama but he managed to get away.

In October 1998, Wiratama was a passenger in a car that was involved in a traffic accident.  A native Indonesian police officer present at the scene approached Wiratama and confiscated his driver's license.  The officer demanded that he pay both the officer and the driver of the other car before allowing him to leave.  Wiratama believes the officer hassled him because he was ethnic Chinese.

Wiratama's wife, Milian Martami, also testified at Wiratama's hearing.  She testified that, when Wiratama picked her up in January 1998, his car window was broken and he was "bleeding

badly."  It looked "like somebody stabbed him."

On June 14, 2005, the IJ denied Wiratama's applications for withholding of removal and protection under the Convention but granted him voluntary departure.  The IJ first ruled that Wiratama's asylum application was untimely; the IJ then denied his application for withholding of removal, finding that he had failed to present "credible evidence" that he would be subject to persecution.  The IJ also denied Wiratama's application for protection under the Convention but granted his application for voluntary departure.  The Board adopted and affirmed the IJ's decision in a brief order.

## II.

Wiratama concedes that his asylum application was untimely, so our review is limited to his applications for withholding of removal and protection under the Convention Against Torture.  Where, as here, the Board affirms and adds some of its own reasoning, we review the Board's reasoning and the underlying IJ decision.  See Lin v. Gonzáles, 503 F.3d 4, 6-7 (1st Cir. 2007).

Withholding of removal is available if "the alien's life or freedom would be threatened in [the destination] country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  The "threat to life or freedom" under withholding of removal is identical to "persecution" under asylum, although the

burden placed on the petitioner is higher. See Attia v. Gonzáles, 477 F.3d 21, 23 (1st Cir. 2007). Persecution "is defined as mistreatment that . . . extend[s] beyond harassment, unpleasantness, and basic suffering." Id. Thus, to qualify for withholding, Wiratama "must demonstrate either that [he] has suffered past persecution on account of a protected ground (thus creating a rebuttable presumption that [he] may suffer future persecution) or that it is more likely than not that [he] will be persecuted on account of a protected ground if sent to the destination country." Heng, 493 F.3d at 48. These two methods of proof are commonly referred to as past and future persecution.

Wiratama premised his withholding claim on the fact that he had been subject to past persecution on account of his religion and ethnicity. He relied heavily on two violent episodes that he experienced in 1998: the January 1998 beating and the May 1998 riot. While Wiratama also offered evidence of other alleged incidents of persecution,[1] these two events formed the core of his withholding claim.

The IJ concluded, however, that Wiratama had not presented "credible evidence" to support his claims. The IJ stated that it was "incredible to believe that he was stabbed . . . and did not go to the hospital[;] that he went to his home[] because

---

[1]     Wiratama also testified that he was harassed at school as a child, that he was harassed by a police officer in October 1998, and that his friends and neighbors have suffered persecution.

- 6 -

his home was closer than the hospital[,] and his mother treated him with Chinese medicines for a stab wound." A.R. 50. The IJ also stated that it was "incredible to believe that if [Wiratama] had experienced what he claims to have experienced in Indonesia, he would have gone back to Indonesia, without fearing for his life." A.R. 49. The IJ added that neither Wiratama's siblings or parents have encountered "any difficulties" in Indonesia. A.R. 49-50. The IJ did not discuss the May 1998 riot, the October 1998 confrontation with the police officer or any of the other evidence offered by Wiratama. The IJ denied Wiratama's application, and the Board affirmed in a brief order.

Although the IJ did not point to any contradictions, discrepancies or omissions in Wiratama's testimony, the parties agree that the IJ had made at least an implicit finding that Wiratama was not credible. The adverse credibility determination appears to have rested entirely on the implausibility of Wiratama's suffering a stab wound but not seeking treatment in a hospital.

We treat credibility determinations "with great respect," and we will not overturn them unless we are compelled to do so. Ang v. Gonzáles, 430 F.3d 50, 57 (1st Cir. 2005). At the same time, "[t]he fact that an IJ considers a petitioner not to be credible constitutes the beginning not the end of our inquiry." Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir. 1990). Adverse credibility determinations must have "sturdy roots in the

administrative record." Aguilar-Solis v. INS, 168 F.3d 565, 571 (1st Cir. 1999). The IJ must also provide "specific and cogent reasons" why an inconsistency, or a series of inconsistencies, render the alien's testimony not credible. Hoxha v. Gonzáles, 446 F.3d 210, 214 (1st Cir. 2006). These inconsistencies must pertain to material facts that are central to the merits of the alien's claims, "not merely to peripheral or trivial matters." See Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999). Finally, where credibility determinations rest "on an analysis of the petitioner's testimony and not her demeanor, the finding may receive less than usual deference." Heng v. Gonzáles, 493 F.3d 46, 48 (1st Cir. 2007).

After reviewing the record in this case, we are compelled to find that the IJ's adverse credibility determination was not supported by substantial evidence or by cogent reasoning. The supposedly "implausible" testimony did not come from Wiratama, and the dispute over whether Wiratama was "slashed" or "stabbed" was too peripheral to Wiratama's claim to discredit his entire testimony.

First, the IJ's credibility determination was not adequately supported by record evidence. The determination was premised upon the fact that "[Wiratama] testified in these proceedings" that he had been stabbed but did not go to the hospital. A.R.50. It was this alleged testimony that appears to

have formed the sole basis for the IJ's adverse credibility decision. Wiratama, however, never testified that he had been "stabbed." Wiratama consistently maintained that one of the attackers had "tried to attack [him] with a knife." A.R.92; see also A.R.114 ("He tried to stab me."). In an attempt to shield himself from the attack, Wiratama "tried to cover [his] eyes, [and] muffle [his] face." A.R.92; see also A.R.113 ("I just tried to cover my face . . . it's better than if they have to scratch my face."). The attacker then "slashed" at him and cut his right hand. A.R.194. Wiratama consistently referred to the resulting injury as a "slash" or a "scratch" that left a "scar on [his] right hand." A.R.113, 114. Not once did Wiratama refer to this event as a "stabbing" or to his injury as a "stab wound." The Government's claim that Wiratama had "changed" his testimony, see Respondent's Br.22 & n.6, is unsupported.[2] Wiratama's testimony at the removal

---

[2] The Government's brief contains the following inaccurate statement: "Wiratama later changed his claim to 'Not stab, but scratch . . . [h]e tried to stab me.' (A.R. 114)." As we have explained, the record does not reflect that Wiratama ever testified that he had been stabbed, so he could not have changed his story. Further, the portion of the record cited by the Government actually demonstrates that Wiratama resisted characterizing the attack as a stabbing even when this characterization was pressed upon him:

Q. Did the men stab you any where [sic] with this knife, sir?
A. He tried to stab me, but I tried to avoid it. []
Q. But did he stab you, sir. Did you receive stab wounds?
A. Not stab, but scratch.
Q. So, no stab wounds, it [sic] that correct, sir?
A. He tried to stab me.
Q. But you had no stab wounds, other than the scratch on the

- 9 -

hearing was not only internally consistent, but also consistent with the statement in his I-589 form. See A.R.194. The only possible conclusion to be drawn from Wiratama's testimony is that his attackers "slashed" at him with a knife and, while shielding his face from the attack, he sustained a cut on his right wrist or hand. (Of course, he also suffered bruises and swelling from the beating itself.) Wiratama himself downplayed the seriousness of the incident, so it is difficult to say that his testimony was implausible.[3]

In fact, the only person who mentioned that Wiratama may have been "stabbed" was his wife, Milian Martami. She testified that when Wiratama came to pick her up he was bruised and it looked "like somebody stabbed him." See A.R. 46-50. Martami never testified that she was present at the scene of the attack; she only described the events that unfolded after Wiritama picked her up. It is apparent that the IJ conflated Wiratama's testimony with Martami's testimony.[4] Even if Martami's testimony could be

_____

wrist, is that correct?
A. No, just that.

A.R.114; see also, infra, n.4.

[3] Indeed, when Wiratama was asked why he did not go to the hospital, he stated that he did not seek treatment at a hospital "[b]ecause it's just like a small scratch." A.R.113.

[4] The Government also conflates Wiratama's testimony and Martami's testimony. Its brief contains a highly misleading statement: "Wiratama and his wife had testified that Wiratama drove his car to pick up his then-fiancee from school after he was

- 10 -

interpreted to constitute a material inconsistency, there is no reason why this inconsistency should be attributed to Wiratama or should impugn Wiratama's credibility.[5] Wiratama insisted that he was never stabbed, so his testimony is not implausible. Because this testimony was the sole basis for the IJ's adverse credibility determination, that determination has no firm support in the record. See Gailius, 147 F.3d at 44 (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456).

We also do not believe that the IJ provided a "cogent reason" for dismissing all of Wiratama's testimony. Hoxha, 446 F.3d at 214. Specifically, the IJ leapt from the conclusion that there was no credible evidence of a "stabbing" (something Wiratama himself does not deny) to the conclusion that there was no credible evidence that Wiratama had ever been "attacked." A.R. 50. This is simply not tenable. Wiratama testified at length that much of the

---

'slashed' and 'like . . . stabbed.' (See A.R. 46, 91-93, 107-108, 113-14, 194)." The construction of this sentence and the citations used to support it suggest that both Wiratama and his wife testified that he had been stabbed. In fact, Wiratama testified only that he had been "slashed," see A.R.91-93, 107-108, 113-14, 194, while Wiratama's wife testified that it looked "like someone stabbed him," see A.R.46. This is particularly disturbing because whether Wiratama testified that he was "stabbed" is a central issue here.

[5]     The IJ's summary of Martami's testimony also briefly suggests that Wiratama had told Martami immediately after the incident that he had been stabbed. See A.R.46. Because Martami's testimony is not in the record, we do not know if the words used were hers. Further, the IJ never suggests that Wiratama had any reason to lie about the incident.

harm suffered from the attack came from the beating; his clothing was torn, his face was swollen and he was left lying by the side of the road. His wife corroborated his testimony in all respects except in the one instance when she mentioned that it looked "like somebody stabbed him."

The disagreement over whether Wiratama had been stabbed or merely slashed is also too immaterial to support a finding that no attack occurred at all. See Bojorques-Villanueva, 194 F.3d at 16. And it certainly does not support a broad credibility determination that would exclude the evidence involving the May 1998 riot, the October 1998 confrontation with the police officer and other events. In sum, our review of the record "compels" the conclusion that the IJ's adverse credibility determination was unfounded.

## III.

The next question, then, is whether the IJ's decision can be affirmed on alternate grounds. See Gailius, 147 F.3d at 44. Of course, we cannot provide these alternate grounds ourselves; they must issue from the agency itself and not from the reviewing court. See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947). We have held, however, that such grounds may be implicit in the IJ's decision. See Pulisir v. Mukasey, 524 F.3d 302, 308 (1st Cir. 2008); Rotinsulu, 515 F.3d at 72-73. While the IJ explicitly stated that Wiratama had not demonstrated a well-

- 12 -

founded fear of persecution, the IJ did not make specific findings regarding Wiratama's evidence of past persecution. As we have previously explained, the failure to make specific findings as to past persecution "unnecessarily complicates our review." Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001). While it is clear in this case that the IJ implicitly rejected the evidence of past persecution, it is less clear whether this decision was based solely on the adverse credibility determination or whether the IJ also found that the mistreatment alleged did not amount to "persecution" under the statute. Nevertheless, upon closer examination, we believe that the IJ made an implicit alternate finding that, even if Wiratama's testimony were deemed credible, the evidence he presented did not support a finding of past persecution.

The IJ acknowledged that Wiratama's central fear was that he would be subjected to "robbery" and "beatings" upon return to Indonesia. A.R.48. The reference to "robbery" and "beatings" is almost certainly a reference to the January 1998 beating (during which Wiratama was robbed) and the May 1998 riot (during which Wiratama was almost beaten). The IJ also acknowledged that "Christians have been discriminated against and persecuted in Indonesia." A.R.51. This is almost certainly a reference to the documentary evidence, provided by Wiratama, on general conditions in Indonesia. More importantly, the IJ noted that, "[a]ssuming

- 13 -

that what he stated is true, . . . [Wiratama] would not be in danger, in that his life or freedom would not be threatened, because he is ethnic Chinese and Roman Catholic." A.R.48-49. The IJ does not use the term "past persecution." But Wiratama presented no independent evidence of a probability of future persecution; his application rested almost entirely on evidence of past persecution. In this context, we believe that the IJ's statement fairly "subsumes the question of past persecution." Rotinsulu, 515 F.3d at 72. We now review this alternate holding for substantial evidence. See Gailius, 147 F.3d at 44.

We find that Wiratama has failed to show that he suffered from past persecution and thus failed to show a clear probability that he would be subject to persecution upon return to Indonesia. Most of the incidents cited by Wiratama in support of his claim require little discussion. His maltreatment at school, which included being the target of name-calling and being roughed up by fellow students, may be discriminatory but it does not rise to the level of persecution. See Kho v. Keisler, 505 F.3d 50, 58 (1st Cir. 2007). Wiratama's confrontation with the police officer, during which Wiratama was apparently forced to pay a bribe, may be a classic example of harassment but it is not persecution. See Bocova v. Gonzáles, 412 F.3d 257, 263 (1st Cir. 2005). Wiratama's experiences during the May 1998 riots were certainly frightening but he did not suffer any physical harm. See Susanto v. Gonzáles,

- 14 -

439 F.3d 57, 60 (1st Cir. 2006). Finally, while the January 1998 beating was severe, it did not require hospitalization. More importantly, we have held that isolated beatings, even when rather severe, do not establish the systematic mistreatment needed to show persecution. See Journal v. Keisler, 507 F.3d 9, 12 (1st Cir. 2007); Attia, 477 F.3d at 23-24; Topalli v. Gonzáles, 417 F.3d 128, 132 (1st Cir. 2005); Bocova, 412 F.3d at 263. These incidents, even when taken together, do not rise to the level of persecution under our case law. Wiratama thus failed to show past persecution.

Finally, as the Board noted in its brief order, the evidence also undercuts any finding that Wiratama has a reasonable fear of future persecution,. See Aquilar-Solis, 168 F.3d at 572. Both the IJ and the Board correctly emphasized the fact that Wiratama's parents continue to live safely in Indonesia; this fact undermines the reasonableness of his fear of persecution. See, e.g., Nikijuluw v. Gonzáles, 427 F.3d 115, 122 (1st Cir. 2005); Zheng v. Gonzáles, 416 F.3d 97, 101 (1st Cir. 2005). Unfortunately, we again note a factual error. The IJ stated that Wiratama's parents and siblings continue to remain unharmed in Indonesia. See A.R. 49-50. Actually, Wiratama's sister now lives in Singapore, and his brother lives in Australia.[6] Nevertheless,

---

[6] The IJ's treatment of the issue is internally inconsistent. Compare A.R.36 ("[Wiratama" has siblings, [a] sister in Singapore and a brother in Australia") with A.R.48 ("[Wiratama] has siblings, living in Indonesia"). The Government makes the same mistake. Compare Respondent's Br.9 ("Wiratama also testified that

- 15 -

it clear that Wiratama's mother and father still live in Indonesia. While this fact is "[not] enough, by itself, to render a fear of persecution unreasonable," it does undermine the reasonableness of Wiratama's fear.  See Eduard v. Ashcroft, 379 F.3d 182, 193 & n.12 (5th Cir. 2004).

Both the IJ and the Board also noted that, "notwithstanding the incidents that he encountered in Indonesia, [Wiratama] left Indonesia and returned to Indonesia."  A.R.49. Again, such facts can "undermine" the reasonableness of an alien's fear of persecution.  See Jean v. Gonzáles, 461 F.3d 87, 91 (1st Cir. 2006).  The record makes clear that even if Wiratama's testimony were taken to be entirely credible, he has failed to establish that he was a victim of past persecution or that he is likely to be persecuted upon return to Indonesia.  His claim for withholding of removal thus fails.  We also note that Wiratama's claim for relief under the Convention is underdeveloped and without merit.  See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004); Aguilar-Solis, 168 F.3d at 574.

## IV.

For the reasons discussed above, the petition for review is denied.

---

his siblings no longer live in Indonesia") with Respondent's Br.25 ("Wiratama's . . . siblings have continued to live unharmed in Indonesia").

- 16 -