# United States Court of Appeals
## For the First Circuit

No. 21-1267

ROMMEL ALEXANDER CHAVEZ,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before
Gelpí, Lipez, and Howard,
Circuit Judges.

SangYeob Kim, with whom Gilles Bissonnette, Caroline Meade, American Civil Liberties Union of New Hampshire, and New Hampshire Immigrants' Rights Project were on brief, for petitioner.

Susan Bennett Green, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, with whom Brian M. Boynton, Acting Assistant Attorney General, Civil Division, and Linda S. Wernery, Assistant Director, were on brief, for respondent.

Anna R. Welch, Clinical Professor, Camrin M. Rivera, Student Attorney, Emily L. Gorrivan, Student Attorney, and Cumberland Legal Aid Clinic, University of Maine School of Law on brief for amicus curiae Immigration Law Professors.

October 21, 2022

**HOWARD**, <u>Circuit Judge</u>.    Rommel Alexander Chavez, a citizen of El Salvador, petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of his application for withholding of removal under the Immigration and Nationality Act ("INA") and for protection under the Convention Against Torture ("CAT").    For the following reasons, we grant the petition in part, vacate the decision of the BIA in part, and remand to the BIA for further proceedings consistent with this opinion.

## I.

### A.

Rommel Alexander Chavez is a 45-year-old Salvadoran citizen who has lived in the United States since 1997, with the exception of a two-month period in 2012.    The IJ found him credible, and the BIA did not disturb that finding.    Cf. <u>Kalubi</u> v. <u>Ashcroft</u>, 364 F.3d 1134, 1141-42 (9th Cir. 2004) ("[A]bsent an adverse credibility determination, testimony must be accepted as true . . . .").    Accordingly, "we accept as true [] [his] testimony about the historical facts."    See <u>Palma-Mazariegos</u> v. <u>Gonzales</u>, 428 F.3d 30, 33 (1st Cir. 2005).

While Chavez was growing up in El Salvador, he and his family had several violent encounters with the police.    In 1978 or 1979, when Chavez was two or three years old, his eldest brother, Oscar, broke a curfew to go see his girlfriend.    In the process,

he ran into the police and was shot and killed by them. Chavez also had a violent encounter with the police in 1991 or 1992, when he was 15 or 16 years old. A group of police officers stopped him on the street and started searching him in an aggressive manner, hitting him at one point with a weapon. He had a bike with him, and they asked him where the papers for it were.[1] He told them that they were at his house, but they nevertheless started trying to take the bike away from him. He tried to grab it from their hands, but they wouldn't stop, and eventually, he began to run away toward his house. Just before he reached his house an officer shot him in his buttocks. When his brother Omar came out of the house to see what was going on, an officer shot Omar, too. Omar still requires the use of a colostomy bag because of that injury.

As a result of that encounter, Chavez was sent to jail for about seven months for "resisting arrest." After his release, he continued to be stopped and beaten up by the police. When he was 12 or 13, he had gotten a tattoo that later came to be associated with a rival gang of MS-13, Mara 18. He testified that although the police "never said anything [to him] about [his] tattoo," because of it, they "simply believed that [he and his friends] were gang members."[2]

---

[1] Chavez explained that at that time, bicycles in El Salvador had "titles like [] car[s]."

[2] Chavez testified that he has never been a member of any

- 4 -

At some point during his teenage years, members of MS-13 began to "insinuat[e]" to Chavez that he should go to their meetings, but he never did. As he explains it, he was always "against" them, and used to erase their graffiti. On one occasion, he drew a Mara 18 symbol over MS-13's symbols. The next day, they found out that he was the one who drew it, showed up to his house, and beat him up, fracturing one of his ribs.

Chavez was also threatened by MS-13 on another occasion. He had told the victim of a robbery that El Churro, a member of MS-13, was the perpetrator, and the victim had proceeded to press charges. At some point, Chavez also told the police that El Churro was the perpetrator. El Churro learned that Chavez had told the victim it was he who did it, and, through another member of MS-13, sent a message to Chavez that, as paraphrased by Chavez, "[Chavez] had [better] take care of [himself] because [El Churro] was going to do something [otherwise]." Chavez took that to mean that El Churro was probably going to "kill [Chavez] or something else, something bad." It appears that Chavez left for the United States shortly thereafter. As he explains it, "[he] was not about to stick around, waiting for" El Churro to act on his threat.

From 1997 until 2012, Chavez lived in the United States. During that period, members of MS-13 killed Mauricio, one of his

_____

gang, and that he got the tattoo out of youthful rebellion.

- 5 -

friends who lived in El Salvador, because Mauricio had refused to pay them rent. And in 2009, members of MS-13 killed Chavez's nephew "supposedly [because] he had some tattoos" and MS-13 therefore "pinn[ed] him as belonging to [a different] gang."

In 2011, Chavez was placed in removal proceedings. He applied for asylum, but his application was denied, and he was removed to El Salvador in May 2012.

On the day he returned to El Salvador, someone came to his house and fired a weapon into the air, which he took to be a "message" to make him "afraid." In addition, after his return, MS-13 murdered his neighbor, Javier, and Javier's dad, Jesus, because they had intervened while MS-13 was stealing some livestock. Chavez testified that he believes that MS-13 associates him with the victims of those murders, as well as with his murdered nephew and friend Mauricio.

On another occasion during his time in El Salvador, he had a conversation with a member of MS-13 who had been beaten up by other members quite badly. Chavez told him that he "shouldn't get involved with them" and that "he could get himself killed." At some point during that conversation, an "entire group" of members of MS-13 showed up, and their "boss" warned Chavez "not [to] mess with them." Chavez speculated that the boss might have said that because "they thought [that Chavez] was advising that guy from the gang -- giving him advice to get out of it." The

- 6 -

next day, the MS-13 member who had been beaten up came to Chavez's house with a weapon and "star[ed] at [his] house [] as if he was going to shoot." Chavez speculated that he may have done that because of "the scolding [Chavez] gave him in front of his boss" and that it was "possible" that his boss sent him to Chavez's house for that reason.

Sometime after that incident, MS-13 told Chavez that they wanted to "investigate" him and "check out [his] tattoos." At that point, Chavez decided to leave his town to go to Miraflores, another town in El Salvador where his mother and brother lived. Two weeks later -- about two months after he had arrived in El Salvador -- thinking that MS-13 was going to "kill[]" him, he returned to the United States.

**B.**

In March 2020, Chavez was placed in withholding-only proceedings. On July 7, 2020, he applied for statutory withholding of removal under the INA and protection under the CAT.

As relevant here, Chavez sought withholding of removal on account of his imputed membership in Mara 18, and his imputed or actual anti-MS-13 political opinion. He alleged that he feared persecution from the police and from MS-13 as to the first ground, and persecution from MS-13 as to the second ground. He also sought protection under the CAT.

The IJ held hearings in the matter at which Chavez and

Dr. Lawrence Ladutke, an expert witness on El Salvador, testified. The IJ denied Chavez's application, and ordered him removed. Chavez appealed that decision, and the BIA dismissed his appeal in a written decision of its own. This petition for review followed.

**II.**

The BIA issued its own decision on Chavez's claims, thus we review that final agency decision. See Reynoso v. Holder, 711 F.3d 199, 205 (1st Cir. 2013). Nevertheless, to the extent that the BIA deferred to or adopted the IJ's reasoning, we review those portions of the IJ's decision. Bonilla v. Mukasey, 539 F.3d 72, 76 (1st Cir. 2008).

We review the agency's findings of fact under the "substantial evidence" standard. Id. (quotations omitted). Under that standard, the agency's determination "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" See INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). "To reverse . . . we must find that the evidence not only supports [a contrary] conclusion, but compels it . . . ." Id. at 481 n.1.

**III.**

Chavez first contends that the BIA's finding that he has not established eligibility for withholding of removal is not supported by substantial evidence. "Withholding of removal is available if '[an] alien's life or freedom would be threatened in

- 8 -

the destination country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" Heng v. Gonzales, 493 F.3d 46, 47-48 (1st Cir. 2007) (quoting Da Silva v. Ashcroft, 394 F.3d 1, 4 (1st Cir. 2005)); see also 8 U.S.C. § 1231(b)(3)(A).

"The 'threat to life or freedom' under withholding of removal is 'identical' to 'persecution' under asylum, [but] the burden placed on the petitioner is higher." Wiratama v. Mukasey, 538 F.3d 1, 3 (1st Cir. 2008). To qualify for withholding, a petitioner "must demonstrate either that [he] has suffered past persecution on account of a protected ground (thus creating a rebuttable presumption that [he] may suffer future persecution) or that it is more likely than not that [he] will be persecuted on account of a protected ground if sent to the destination country." Id. at 4 (quoting Heng, 493 F.3d at 48) (alterations in original).

## A.

Chavez first challenges the agency's determination concerning his actual or imputed anti-MS-13 political opinion.[3] To qualify as a political opinion, an opinion "must involve some support for or disagreement with the belief system, policies, or

---

[3] In the proceedings below, Chavez also sought withholding of removal on the basis of his actual or imputed anti-government political opinion. However, in his petition, he does not challenge the denial of withholding of removal based on that political opinion. Accordingly, we do not address it.

practices of a government and its instrumentalities, an entity that seeks to directly influence laws, regulations, or policy, an organization that aims to overthrow the government, or a group that plays some other similar role in society." Zelaya-Moreno v. Wilkinson, 989 F.3d 190, 199-200 (2d Cir. 2021) (citations omitted). An opinion for this purpose can be "actual" or "imputed." To prevail on an actual political opinion claim, a petitioner must (1) show that he holds a political belief, (2) prove that the persecutors perceived that political belief, and (3) prove that the persecution was because of that political belief. See Mendez-Barrera v. Holder, 602 F.3d 21, 27 (1st Cir. 2010); Zhakira v. Barr, 977 F.3d 60, 67 (1st Cir. 2020). To prevail on an imputed political opinion claim, a petitioner must show that (1) the persecutor perceived him to hold a political belief, and (2) the persecution was because of that perceived political belief. See Archila v. Holder, 495 F. App'x 98, 100 (1st Cir. 2012).

In his petition, Chavez contends that the BIA's conclusion that MS-13 would not perceive him to hold an anti-MS-13 political opinion was not supported by substantial evidence. Because we conclude that it was, we need not examine his other contentions concerning his political opinion claim.[4]

---

[4] Among other things, Chavez also contends in his petition

- 10 -

The BIA stated that it was "affirm[ing] the [IJ's] determination that the applicant did not establish he was or would be harmed based on his actual or imputed anti-gang . . . political opinion"; thus, we review the IJ's decision as part of the BIA's decision.  The IJ stated that

> The respondent himself testified that the gangs attacked the respondent because they thought he was a rival. Furthermore, the court will find that the respondent was opposed to criminal acts as a concerned citizen within his area, and [that] based on th[at] [he] has failed to . . . show . . . a nexus to the political opinion of anti-MS-13 gang membership.  There is insufficient evidence that the respondent was expressing an [anti] MS-13 gang political opinion; rather, he was a local concerned citizen opposed to criminal acts within his neighborhood, and he also testified that the gang members thought he was a threat to them.  The court finds this is insufficient to constitute political opinion.

The IJ further stated that Chavez did not have an "objective well-founded fear of future persecution" as to any political opinion

_____

that the BIA improperly required him to show that his political opinion was or would be a "central reason" for his persecution rather than "a reason" for it.  That contention stems in part from a circuit split concerning whether an applicant for withholding of removal must show that a protected ground was or would be "at least one central reason" for his persecution, or merely that the ground was or would be "a reason" for it.  Compare, e.g., Barajas-Romero v. Lynch, 846 F.3d 351, 360 (9th Cir. 2017) (a reason), and Guzman-Vazquez v. Barr, 959 F.3d 253, 274 (6th Cir. 2020) (same), with Gonzalez-Posadas v. Att'y Gen., 781 F.3d 677, 685 n.6 (3d Cir. 2015) (one central reason), and Vazquez-Guerra v. Garland, 7 F.4th 265, 271 (5th Cir. 2021) (same).  The government counters that we have already determined that the "one central reason" test is the appropriate one; Chavez contends that language to that effect in our caselaw is dicta.  See, e.g., Marquez-Paz v. Barr, 983 F.3d 564, 565 (1st Cir. 2020).  As noted, it is unnecessary to resolve such issues here, if in fact we have not already resolved them.

- 11 -

because "[i]n 2012 . . . there was a shooting outside of his house by unknown individuals" and there was "a threat at gunpoint" which was the result of a "personal dispute with a gang member; it was not on account of a[n] anti-MS-13 political opinion."

The BIA in turn stated that "[t]he applicant's evidence that he was the victim of gang violence, resisted gang recruitment, reported criminal activity to the police, and painted graffiti of a rival gang . . . does not establish that [he] actually held or was perceived to hold a political opinion." And it added that

> [T]he applicant testified that gang members attacked him because they presumably believed he was part of a rival gang and perceived him as a threat . . . . This evidence does not satisfy the applicant's burden to establish that his alleged persecutors believed or would believe he holds a political opinion.

As noted, Chavez must show that his persecutors perceived or would perceive him to hold a political opinion regardless of whether he contends that he actually held that opinion, or only that it was imputed to him. Thus, we focus on MS-13's perception of his opinion. Chavez contends that the IJ made a factual finding, which the BIA accepted, that MS-13 perceived him as a rival gang member, and separately, as a local concerned citizen opposed to criminal acts within his neighborhood. He rightly appears to concede that an anti-MS-13 opinion based upon membership in a rival gang is not a political opinion. See Marín-Portillo v. Lynch, 834 F.3d 99, 101 (1st Cir. 2016) (noting that "disputes motivated by revenge," or otherwise

of a personal nature, are not "motivated by an enumerated statutory ground" for asylum and therefore do not support relief). But he contends that being a concerned citizen opposed to criminal acts within his neighborhood is holding a political opinion (and, thus, that MS-13 perceives him to hold a political opinion).

We need not decide whether he is correct that his opposition amounted to a political opinion because neither the BIA nor the IJ found that MS-13 perceived such opposition (notwithstanding Chavez's contentions to the contrary). It is true that the IJ found that Chavez was opposed to criminal acts within his neighborhood. But the IJ did not find that MS-13 perceived his actions as motivated by such opposition -- rather, the IJ found that, regardless of Chavez's actually held opposition to crime, MS-13 perceived his actions as motivated by membership in a rival gang. The IJ stated that "[Chavez] himself testified that the gangs attacked the respondent because they thought he was a rival"; the BIA likewise stated that "[Chavez] testified that gang members attacked him because they presumably believed he was part of a rival gang and perceived him as a threat." Accordingly, although the IJ and the BIA appeared to credit that Chavez was in fact motivated by his opposition to criminal acts, they did not find that MS-13 perceived or would perceive that opposition; rather, they concluded that MS-13 had perceived and would continue to perceive him as a rival gang member.

- 13 -

Moreover, that conclusion was supported by substantial evidence. Here, MS-13 knew that Chavez had painted over its graffiti with the symbol of a rival gang (and attacked him for it), and in 2012, when he returned to El Salvador, an MS-13 member told him that they wanted to "investigate" him and "check out [his] tattoos" (which was the point at which Chavez decided to leave El Salvador, because he does in fact have a tattoo associated with that rival gang). It is true that Chavez also took a number of other actions against MS-13 that, in isolation, could have been viewed by MS-13 as based upon general opposition to crime: he advised an MS-13 member to quit; told the police that one of their members had committed a robbery; and was "always say[ing] [to MS-13]" that he "didn't like their painting on the walls," and "scolding them because they were always breaking glass bottles," which "bother[ed]" him because kids in that area were frequently barefoot. But, because MS-13 knew that Chavez had painted the symbol of a rival gang over its graffiti, it was not unreasonable for the BIA and the IJ to conclude that MS-13 would have viewed his subsequent conduct as motivated by his supposed membership in that rival gang, rather than by general opposition to crime as a citizen.

For those reasons, the BIA's conclusion that Chavez would not be perceived to hold an anti-MS-13 political opinion, and that his claim based on that political opinion therefore

- 14 -

failed, was supported by substantial evidence.

**B.**

Chavez also alleged that his life or freedom would be threatened in El Salvador by both MS-13 and the police because they would incorrectly perceive him as a member of a gang. Specifically, he claimed that he will be incorrectly perceived as a member of Mara 18 due to his tattoo and will suffer harm as a result. For a proposed social group to be cognizable, an applicant must show that the group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." Paiz-Morales v. Lynch, 795 F.3d 238, 244 (1st Cir. 2015) (quotations omitted).

In his petition, Chavez contends that Salvadorans incorrectly perceived to be gang members can be a "particular social group" within the meaning of the INA, notwithstanding the BIA's statement that they cannot, and that the BIA thus erred in relying on that rationale to reject his social group claim. He further contends that the BIA did not provide any alternative rationale for rejecting that claim, and therefore, remand is required. In response, the government argues that the BIA's rationale was correct -- that is, Salvadorans incorrectly perceived to be gang members cannot, as a categorical matter, be a "particular social group" under the INA -- but appears to agree

that, in the event that we disagree, remand is required at least as to persecution by MS-13 based upon that group.

The government contends, however, that the BIA adopted one of the alternative rationales that the IJ gave for rejecting Chavez's social group claim as to persecution by the police and thus, remand is not required as to that part of his social group claim even if we reject the BIA's categorical rationale. Specifically, it points to the BIA's statement that "the [IJ] properly found that the police never mentioned that they stopped him because of his tattoos." Chavez explains, however, that he is not asserting past persecution based on the incorrect perception that he is a gang member, but rather, that he will be persecuted in the future on that account because the police will discover his tattoo when they detain him pursuant to COVID-19 precautions. Although the IJ determined that Chavez had not shown that it was more likely than not that he would be harmed in the future by the police on account of the police incorrectly perceiving him to be a gang member, it is not clear from the BIA's opinion whether it adopted that ground provided by the IJ. "When the BIA does not consider an IJ's alternative ground for denying relief, that ground is not before us." Bonilla, 539 F.3d at 81-82. We thus focus on the validity of the BIA's conclusion that, as a categorical matter, Salvadorans incorrectly perceived to be members of a gang cannot be a valid particular social group under the INA.

- 16 -

In concluding that that group is not a valid particular social group, the BIA relied on Cantarero v. Holder, 734 F.3d 82, 86 (1st Cir. 2013) and Matter of E-A-G-, 24 I. & N. Dec. 591 (BIA 2008). In Matter of E-A-G-, the BIA held that although being a member of a gang, and therefore, being incorrectly perceived as a member of a gang, entails some social visibility, such groups were nevertheless not cognizable under the INA. E-A-G-, 24 I. & N. Dec. at 595-96. It reasoned that Congress did not intend to grant protection to actual gang members, and thus, "[because] membership in a criminal gang cannot constitute a particular social group, [a] respondent [also] cannot establish particular social group status based on the incorrect perception by others that he is such a gang member." Id. at 596.

In Cantarero, we upheld as reasonable a determination by the BIA that former gang members do not constitute a cognizable social group under the INA. Cantarero, 734 F.3d at 87. We noted that the BIA had "cited extensively to its decision in Matter of E-A-G-" and had reasoned that "recognizing former members of violent criminal gangs as a particular social group would undermine the legislative purpose of the INA." Cantarero, 734 F.3d at 85.

However, Cantarero did not determine whether the holding of Matter of E-A-G- that is relevant here -- that people who are incorrectly perceived to be members of gangs cannot, as a categorical matter, constitute a particular social group under the

- 17 -

INA -- is reasonable. "Where, as here, the BIA rejects an applicant's proffered social group on legal grounds, its decision is subject to de novo review." Cantarero, 734 F.3d at 84. And "[b]ecause we are confronted with a question implicating 'an agency's construction of the statute which it administers,' we follow Chevron principles in our review." Id. at 84-85 (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984)). Here, because the term "particular social group" is ambiguous, we must uphold the BIA's interpretation if it is based on a "permissible construction of the statute." Cantarero, 734 F.3d at 85 (quoting Chevron, 467 U.S. at 843).

Generally speaking, "[s]ocial group determinations are made on a case-by-case basis." Paiz-Morales, 795 F.3d at 245 (quotations omitted). None of the reasons that Matter of E-A-G- provided for determining that actual gang membership cannot constitute a "particular social group" apply to those who are incorrectly perceived to be gang members, who do not necessarily have a criminal past. The other reasons that the government offers are likewise deficient. Specifically, it contends that the difference between imputed and actual gang membership can be a hard line to draw, and that imputed membership in a particular group cannot be cognizable if the actual group is not.[5] But the

_____

[5] The government contends that it is a hard line to draw in

- 18 -

first issue can be resolved on a case-by-case basis, and the second does not appear to have previously been a bar to recognition. Cf. Pirir-Boc v. Holder, 750 F.3d 1077, 1084 (9th Cir. 2014) (noting that the BIA "may not reject a group solely because it had previously found a similar group in a different society to lack social distinction or particularity"). Therefore, even under our deferential review, we are compelled to reject as impermissible Matter of E-A-G-'s holding that a group made up of those who are incorrectly perceived to be members of a gang is categorically barred from recognition as a particular social group under the INA. In doing so, we join the Ninth Circuit, which rejected that holding based on its conclusion that the reasons for finding that actual members of a gang are barred from recognition simply "do not apply" to those incorrectly perceived to be gang members. Vasquez-Rodriguez v. Garland, 7 F.4th 888, 898-98 (9th Cir. 2021).[6]

this case but does not in fact contend that Chavez is or was a gang member. Moreover, the IJ found Chavez's testimony credible, and thus accepted his testimony that he has never been a gang member. And the BIA did not disturb that finding.

[6] The Tenth Circuit in an unpublished, non-precedential opinion also rejected that same holding based on its conclusion that applying those reasons to those who are incorrectly perceived to be gang members is an "irrational leap." Escamilla v. Holder, 459 F. App'x 776, 786 (10th Cir. 2012). The court nevertheless rejected the petitioner's proposed social group because it found that the proposed group -- "Salvadoran men believed to be gang members of a rival gang" -- differed "significantly" from the proposed group in Matter of E-A-G-. Escamilla, 459 F. App'x at 787. It reasoned that being a member of a "rival gang" was defined "not by society's perception of the group, but by the perceptions

- 19 -

We thus remand for the BIA to consider in the first instance whether Chavez's proposed social group satisfies the requirements for constituting a particular social group under the INA to which he belongs. We express no opinion as to the merits of that issue other than to emphasize that the BIA cannot reject such a group based solely on its determination that current or former gang members cannot form a particular social group. In addition, on remand, the BIA may consider the alternative grounds the IJ gave for rejecting his claim based on his proposed social group -- that is, that he did not show a clear probability of future persecution, and that the government is able and willing to protect him. See Bonilla, 539 F.3d at 82 (finding remand "appropriate" where the BIA had "not yet considered" the IJ's alternative ground).[7]

_____

of the . . . 'rival gangs'" and therefore "fail[ed] the first prong of the social visibility test." Id. (emphasis added). Here, Chavez does not use such terminology; he defines his group as persons "incorrectly perceived" or "imputed" to be gang members.

[7] On remand, certain parts of the BIA's opinion discussing Chavez's CAT claim may also be relevant to Chavez's social group claim. For example, the BIA endorsed the IJ's discussion of "government action" to combat gangs in its discussion of Chavez's CAT claim, which is relevant to claims for withholding of removal as well. See Mendez-Barrera, 602 F.3d at 27. It also noted, in discussing petitioner's eligibility for protection under the CAT, that "generalized evidence of official corruption in the Salvadoran law enforcement community [does not] suffice to prove that a Salvadoran public official would more likely than not torture him, or consent to or acquiesce in his future torture by gang members." Nevertheless, with the sole exception noted above, which we have determined is insufficient, the government takes the

- 20 -

Chavez also contends that the BIA's determination that he has not demonstrated eligibility for protection under the CAT is not supported by substantial evidence, and that the BIA made an error of law in its assessment of willful blindness. To qualify for that protection, Chavez must show that "it is more likely than not that he . . . would be tortured if removed to [El Salvador]." 8 C.F.R. § 1208.16(c)(2). Unlike eligibility for withholding of removal, relief under the CAT is available even if the risk of torture is not on account of any protected ground. Rashad v. Mukasey, 554 F.3d 1, 6 (1st Cir. 2009). Torture is defined as "any act by which severe pain or suffering . . . is intentionally inflicted on a person . . . when such pain or suffering is inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official . . . or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1).

In considering Chavez's eligibility under the CAT, the IJ first found that Chavez had not been tortured in the past. The IJ reasoned that the incident when he was shot as a teenager "[was] not torture because it was not an act that was specifically

---

position that remand is necessary if this court rejects the relevant holding of Matter of E-A-G-. Nor did the BIA discuss such issues in the context of Chavez's claim for withholding of removal. Thus, the court will leave such items for the BIA's consideration on remand.

- 21 -

intended to cause severe mental pain or suffering" and that, "[r]ather, [Chavez] had been stopped and detained by police, he was uncooperative with the police and unable to comply with their demands, and attempted to flee the scene when he was shot."

The IJ further found that "[e]ven if [the shooting incident] had constituted torture" it was not more likely than not that he would be tortured in the future because "he has had no interactions with the police at least since he was 15 or 16 years old."[8]  The IJ further stated that

> Even when he was deported back to El Salvador in 2012, he never had any interactions with government officials. To the extent he would be persecuted by a private actor [MS-13] . . . as noted in the court's above discussion on government action . . . the actions of the gang members . . . are not done with the acquiescence or on behalf of the government officials; rather, government officials are attempting to prosecute and prevent any violent criminal actions by the gang members.

In reaching its conclusion regarding consent or acquiescence, the IJ referred back to its discussion of government action in the withholding context, in which it held that Chavez had not shown that "the government [was] unwilling or unable to protect him."  The IJ pointed to:  (1) evidence that showed that El Churro had been prosecuted for rape, which the IJ found was

---

[8] Chavez testified that after his release from jail after the 1991 or 1992 incident with the police, he continued to be stopped and beaten up by the police.  However, no additional details concerning such incidents are evident from the record, nor does Chavez contend that the IJ's finding that he did not have any incidents with the police after the age of 15 or 16 was erroneous.

"proof that the El Salvadoran government does generally prosecute gang members"; (2) the testimony of Dr. Ladutke, who, as paraphrased by the IJ, testified that the gangs had been classified by the government as terrorists; that there was insufficient evidence that the police would harm Chavez or detain him upon his deportation;[9] and that anti-terrorist laws, even if ineffective, show a willingness on the part of the government to prosecute crimes by gang members; and (3) certain articles submitted by the government. The IJ noted as to such articles that although many of them were from 2016, a more recent New York Times article published in August 2019 reported that homicides were declining across the country;[10] the president was deploying police and

---

[9] Chavez contends that the IJ's statement that Dr. Ladutke "said [that] there was insufficient evidence that the police would harm [Chavez] or detain him upon his deportation" "mischaracterize[s]" his testimony. But Dr. Ladutke testified that he did not have any evidence that "just by [the] act of being deported" Chavez would be harmed by the police, and that he would only be harmed if there were an "encounter." Thus, the issue is whether it was reasonable for the IJ to conclude that the likelihood of such an encounter was lower than the relevant threshold.

[10] Dr. Ladutke testified that such numbers have been "monkeyed with," and the IJ does not appear to have addressed such testimony. The BIA has stated that "[w]hen the [IJ] makes a factual finding that is not consistent with an expert's opinion, it is important . . . to explain the reasons behind [that] finding[]." Matter of M-A-M-Z-, 28 I. & N. Dec. 173, 177-78 (BIA 2020). However, even if the IJ should have addressed Dr. Ladutke's testimony to that effect, that was only one of several reasons the IJ gave for concluding that the government was not unwilling or unable to protect Chavez. See In re San Juan Dupont Plaza Hotel Fire Litig., 994 F.2d 956, 968-69 (1st Cir. 1993) (noting that

soldiers to shopping and commercial areas to combat extortions; and a week earlier, a court had sentenced 72 MS-13 members to prison terms of 260 years for 22 killings. The IJ concluded that such evidence refuted Chavez's contention that the Salvadoran government would consent or acquiesce to his torture.

The BIA agreed with the IJ as to Chavez's claim for protection under the CAT, noting that "generalized evidence of official corruption in the Salvadoran law enforcement community [does not] suffice." It agreed that the incident in which Chavez was shot as a teenager was not torture, and that "the [IJ] properly found that [] government officials in El Salvador have taken actions to prosecute gang members and to prevent gang violence." It concluded that while "gang violence continues to be a problem in El Salvador, the government is actively attempting to combat gangs" and "[t]he record does not sufficiently establish that any Salvadoran public official would seek to torture [him] or would acquiesce in or exhibit willful blindness toward any torture inflicted on him by any gang members or anyone else."

Chavez first contends that the BIA's decision as to his CAT claim should be reversed because it erroneously applied the concept of willful blindness to the issue of whether public officials would breach their legal responsibility to intervene to

appellate court may forgo remand where remanding would be an "empty exercise").

- 24 -

prevent torture.  A public official "[a]cquiesce[s]" in activity constituting torture if, prior to such activity, he or she is "[1] aware[] of such activity and [2] thereafter breach[es] his or her legal responsibility to intervene to prevent such activity."  8 C.F.R. § 1208.18(a)(7).  We have stated previously that "[a]cquiescence includes willful blindness."  Perez-Trujillo v. Garland, 3 F.4th 10, 18 (1st Cir. 2021).  Chavez contends that the BIA's statement that "the [IJ] properly found that [] government officials in El Salvador have taken actions to prosecute gang members and to prevent gang violence" relates to the awareness prong, and that its statement that "[t]he record does not sufficiently establish that any Salvadoran public official . . . would acquiesce in or exhibit willful blindness toward any torture inflicted on him" illustrates that the BIA mistakenly applied willful blindness to the breach of legal responsibility prong.  In support, he notes that the awareness prong is distinct from the legal responsibility prong.  H.H. v. Garland, Nos. 21-1150 & 21-1230, slip op. at 22-23 (October 21, 2022); Khouzam v. Ashcroft, 361 F.3d 161, 171 (2d Cir. 2004) ("[T]orture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it.").

But Chavez's contention misconstrues the BIA's statements.  The first excerpt discusses the measures that the

- 25 -

government is taking to "prevent gang violence," which is central to the legal responsibility prong, while the latter excerpt that refers to willful blindness appears to address the awareness prong. Thus, contrary to Chavez's contentions, the BIA concluded that the government would not breach its legal responsibility to intervene without any mention of willful blindness.

Chavez further argues more generally that the record compels the conclusion that he was previously tortured and that Salvadoran officials will more likely than not torture him or ignore torturous acts inflicted upon him by MS-13 in the future. Among other evidence, he points to Dr. Ladutke's testimony that he should be "very concerned" that "if he ha[s] an encounter with the police," "he will be mistaken for a gang member and targeted by the police and security forces on that basis," and to a Human Rights Watch report from February 2020 stating that "[o]fficials interviewed for this report thought tattoos were the most common factor among deportees who were killed," that "gangs will kill them, as will others," and that in March 2019 the El Salvadoran police had severely beaten a man whom "they suspected of gang membership or hiding weapons or drugs," and set fire to a field where he was unconscious, leaving him with "burns to his face and feet." He further contends that Dr. Ladutke's testimony that "[the police] will obsessively checkpoint that they [indiscernible] for a tattoo" shows that the police will use checkpoints on the road

to look for Chavez's tattoo, and therefore, his chance of encountering them is almost certain. He also notes that Dr. Ladutke testified that "[d]uring the pandemic, the government has been detaining everyone entering El Salvador and putting them into this general quarantine area . . . [which includes] gang members" who have been "threatening" people there. He did not testify as to the frequency of such threats but testified that "the government is not taking adequate measures to protect the people in these quarantine centers [from the gangs]."

Although such evidence is undoubtedly concerning, we cannot say that it was improper for the BIA and the IJ to credit certain other evidence that the government is in fact taking measures to protect the population against gang members. See Perez-Trujillo, 3 F.4th at 20-21 (noting that record evidence concerning the government's "difficulty controlling gangs" did not compel a finding of acquiescence to torture, given the countervailing evidence of government efforts to incarcerate gang members involved in criminal activity); Mayorga-Vidal v. Holder, 675 F.3d 9, 20 (1st Cir. 2012) (noting that evidence that the government's "efforts at managing gang activity [are not] completely effectual" did not compel a finding of acquiescence in light of multiple government initiatives to arrest gang members and hold accountable police officers who assisted gangs).

As to the risk of torture by the police, because the BIA

- 27 -

stated that it "agree[d] with the [IJ] that the applicant has not met his burden of demonstrating eligibility for protection under the CAT," citing to the portion of the IJ's decision that reviewed his eligibility for protection under the CAT, we review both decisions. The IJ specifically noted that Chavez "had no interactions with the police" since 1991 or 1992, although he remained in El Salvador until 1997, and that "when he was deported back to El Salvador in 2012, he never had any interactions with any government officials." That was a reasonable basis on which to discount Dr. Ladutke's testimony as to the fact that the police would "obsessively" use checkpoints to find his tattoo, given that he had the same tattoo during all of those time periods. Cf. Seide v. Gonzales, 137 F. App'x 364, 369 (1st Cir. 2005) (concluding that petitioner had not established eligibility for protection under the CAT because "from January to August 2001, [he] lived openly in Port-au-Prince . . . [and] was not specifically targeted by any individuals").[11]

Finally, Chavez contends that the incident in which the police shot him when he was a teenager constituted past torture.

---

[11] Chavez also states that he is concerned that "the police [will discover his tattoo] because he will be detained pursuant to COVID-19 precautions." But Dr. Ladutke does not appear to have viewed the mandatory quarantine as an encounter with the police; rather, he discussed the potential harm posed by gangs in that setting. And there is no evidence that the police are checking deportees for tattoos in the quarantine centers.

But a finding to that effect would not have changed the BIA's decision. The IJ stated that "[e]ven if" the shooting incident "had constituted torture," its conclusion would not have changed in light of the fact that Chavez remained in El Salvador without any incident with the police from 1991 or 1992 until 1997, and did not have any interactions with them when he returned to El Salvador for two months in 2012. Although we strongly agree with the BIA's characterization of the incident in question as "condemnable," we also agree that, in light of how many years ago it occurred and of Chavez's lack of encounters with the police in the years since, even if it was torture, it does not compel a conclusion that Chavez will more likely than not be tortured in the future if removed.

**V.**

For the foregoing reasons, we **grant** in part the petition for review, **vacate** in part the order of the BIA, and **remand** the case to the BIA for further proceedings consistent with this opinion.